The matter sub judice is based upon proceedings instituted by the attorney-general of New Jersey against the defendants under chapter 79 of the laws of 1927, as amended, known as "New Jersey Securities act," sometimes referred to as a "blue sky law." It appears that on or about June 1st, 1929, the defendant, James J. Wallace, commenced business in the Odd Fellows Building, Jersey City, New Jersey, under the trade name of Wallace Company. Associated with him were the defendants Alfred Leonard, George Clayton and Gordon F. Allen. During the latter part of the year 1928 or the early part of 1929, and for approximately a year prior thereto, Wallace had been employed as office manager by one Charles Beadon in the city of New York in connection with two publications, one known as the "Stock Market Reporter" and the *Page 354 
other known as "The Trend of the Market." Clayton had also been employed by Beadon at about the same period to write the daily market letter for the "Stock Market Reporter" and "The Trend of the Market." In 1928 proceedings were instituted against Beadon by the attorney-general of the State of New York under authority of article 23-A of the general business law of the State of New York and later an injunction was issued against him. Thereafter, publication of the "Stock Market Reporter" and "The Trend of the Market" was discontinued, and in the early part of the year 1929 Beadon was indicted by the United States grand jury in the southern district of New York for using the United States mails in furtherance of a scheme to defraud. I deem it unnecessary, for the purpose of my determination of the matter sub judice, to comment upon subsequent proceedings under said indictment. The defendants, Wallace and Clayton, following their connection with Beadon in New York, located at the aforesaid address in Jersey City, where they were associated in conducting a business under the name of Wallace Company, purporting to furnish impartial, expert, financial advisory service, for which they charged a stipulated fee. Their method of operation was to buy lists of names and addresses from firms established for the purpose of selling such lists, and thereby they were enabled to circularize their clientele. The magnitude of their business operations is indicated by the fact, established by proof herein, that between May 7th, 1929, and September 6th, 1929 (both dates inclusive), more than $40,000 was paid to the United States post office for postage. It also appears that another method employed by the defendants for making contact with their prospective customers was by telephone. The extent to which they made use of such medium of communication with their prospects is manifested by the fact, established by proofs herein, that during the period above mentioned the defendants toll charges paid to the telephone company was approximately $30,000. It appears that ten trunk telephone lines and ten auxiliary telephone lines were installed in the offices rented and occupied by the defendants. It appears also that when *Page 355 
application was made by the defendants, in the name of Wallace 
Company, for the furnishing of telephone service, the telephone company required, and received, a deposit of $5,000 as security for the payment of monthly telephone bills. In the month of July following they were required to increase the deposit to the sum of $10,000. The proofs disclose that another medium through which the defendants furnished the alleged impartial, expert, financial advisory service was a publication known as "The Tape and Ticker," which consisted of a daily market letter, a complete file of which was put in evidence, and a weekly market survey, a complete file of which was also put in evidence. The charge made by the defendants for the aforesaid service was $5 a month. The income derived by the defendants therefrom reached approximately $60,000 a month, from approximately twelve thousand paying subscribers. The proofs disclose also that thirty-eight thousand persons received the above-mentioned publication gratuitously over varying periods, on trial. A scrutiny of the reading matter contained in such publication indicates that nothing was said therein which might lead the reader to believe that it was what may be termed a come-on-sheet, until the issue of June 20th, 1929, when in "The Tape and Ticker" the defendants, by means of such publication, called the attention of the subscribers and readers thereof to what was described as "a low priced sleeper," which was claimed to have been uncovered by them. Such was apparently contemplated for a subsequent spectacular market play. This was followed by similar statements in said publication until the issue of June 24th, 1929, wherein particular attention was directed to a stock known as "American Electric Switch Common A," which stock was then listed on the New York Produce Exchange. It is clearly manifest from the reading matter of said publication, and particularly of the issues hereinabove mentioned, that the defendants intended that subscribers and readers thereof should believe that a pool was operating in the shares of the aforesaid stock and that said pool was washingout a small floating supply of said stock in contemplation of active market operation therein. In subsequent issues of the *Page 356 
daily bulletin of "The Tape and Ticker," up to and including July 12th, 1929, the defendants continued their recommendation of the purchase of the aforesaid stock at prices varying from $17 per share to $25 per share, and in the issue of July 12th, 1929, published the following statement:
"American Electric Switch Common `A': The president of this company in a recent interview stated that they are fast approaching a dividend basis and that a market above 30 should easily be maintained in these shares"
On the very date when the aforesaid statement was published the above-described stock was stricken from the list of stocks traded in on the New York Produce Exchange. Such fact I regard as significant in my consideration of the matter sub judice. An illustration of the wide scope of the defendant's activities in the aforesaid stock is manifested by the affidavit, filed as proof herein of Rev. John L. Brandt, of 927 South Gramercy Drive, Los Angeles, California. It appears therefrom that Rev. Brandt bought several shares of American Electric Switch Corporation Common A stock, after having received letters and circulars from Wallace Company, and also after a telephone call in which the defendants represented that the stock would be listed on the market (meaning the New York Curb Exchange, because it had already been stricken from the New York Produce Exchange) at $30 per share on August 15th, 1929, and that the defendants had over ten thousand customers whom they were notifying so that all of them could avail themselves of the advantage of purchase before the floating supply of stock was gone, and before the pool
would control the market. It appears that said stock was never listed on the New York Curb Exchange. Another stock recommended by the defendants was New Mexico Copper and Manganese Corporation. The first mention of it was in an issue of "The Tape and Ticker," dated June 17th, 1929, wherein it was stated that it was being quoted around $4.12 1/2 to $4.25 a share. No particular prominence was given thereto after such publication until the issue of July 11th, 1929, when subscribers and readers were *Page 357 
urged by divers means to buy said stock "for both the long pull and quick market play." The first recommendation of said publication was to purchase said stock at $1.70 a share. Subsequent publications recommended the purchase thereof at various prices. In an issue of said publication dated September 9th, 1929, subscribers and readers were recommended to purchase said stock at a price of $5 per share. The proofs disclose that during all of the period when such recommendations were made, as above stated, the defendants had a call on one James P. Kane of Boston, Massachusetts, for one hundred thousand shares of the stock of New Mexico Copper and Manganese Corporation at $1 a share. The defendants concealed such fact from the subscribers and readers of their aforesaid publication, to whom they were holding themselves out as giving expert, impartial, financial advisory service for the fee paid to them by the subscribers. It is clearly manifest from the proofs that the so-called service
furnished by the defendants, through the aforesaid publication, was neither impartial, nor expert, nor was their advisoryservice disinterested, but on the contrary was solely intended as furnishing a medium through which they could unload various issues of worthless or practically worthless stock on unsuspecting and gullible subscribers and readers of defendants' aforesaid publication and weekly market survey. The above-mentioned New Mexico Copper and Manganese Corporation stock is a fair illustration of the operations of said defendants, the sale whereof would net them a profit of as high as approximately four hundred per cent. over the price at which they could obtain the same. A perusal of "The Tape and Ticker" indicates that defendants' recommendations of stock purchases were interwoven with news items relating to substantial or standard market securities. The proofs disclose there were representations made by the defendants of great activity in such stock on the Denver Stock Exchange, on which it was listed for a time, but that on or about August 1st, 1929, the governing body of that exchange struck it from their list. Then followed statements indicating heavy trading on the Reno Stock Exchange and *Page 358 
"The Tape and Ticker," in the August 7th, 1929, issue, spoke of a "swarm of buying orders" which had made their appearance on that exchange, forcing the price up, as was said from $1.90 to $2 on volume, and closing at the top price of the day, at which figure trading was resumed the following morning. In the issue of "The Tape and Ticker" of August 16th, 1929, the defendants represented that it had been reported that thousands of shares of the aforesaid stock had changed hands in one day at the Reno Exchange, notwithstanding, as the proofs disclose, the prices which the stock of the New Mexico Copper and Manganese Corporation were bought and sold on the Reno Exchange were artificially effectuated by the defendants, James P. Kane and those associated with them. It appears to me that they were what are frequently described in stock market speculation as "wash-sales."
The proofs show that by means of telephone and telegraph service the defendants operated extensively throughout the United States from their headquarters in Jersey City. Complainant's affidavits show that in advertising "The Tape and Ticker" for subscription by the public it was represented that each subscriber, as part of the service, would be entitled to an analysis or opinion on all of the subscriber's stock holdings by one of the best statisticians and prognosticators of the stock market movements. It appears that the defendant Leonard was the man who made such analysis and gave opinions, representing himself to be the statistician for the promoters of said enterprise, yet said Leonard had never been engaged in statistical work of any description before his connections with the defendants, and had never been employed by a statistical or security selling organization. In advertising their service to the public for subscription, the defendants represented that they had formed a strong organization which, with the assistance of a staff of expert market writers and statisticians, was publishing the most amazing and accurate and sensational daily market letter, yet the person who was responsible for the amazing,accurate and sensational daily market letter during all of the time it was issued by the defendants, was the defendant Clayton, hereinabove mentioned. In advertising *Page 359 
"The Tape and Ticker" for subscription, defendants also made the following representation:
"As you subscribe we are going to pool your subscription with those received from two thousand subscribers — a total of $10,000, and turn this sum over to a speculative fund. Each unit will be limited to two thousand annual subscribers. With these subscription moneys a brokerage account will be opened and purchase and sale of stocks will be made for your benefit on a profit sharing basis. Each succeeding month as the units of $10,000 for subscriptions are received, they will be deposited to the credit of the speculative fund, so that at the end of the year a total of $120,000 will have been received in each unit of the speculative fund and in active operation in the market.
"At the expiration of one year from the date of the first transaction in each unit of the speculative fund the account in that particular unit will be dissolved and the paid-up annual members of that unit will receive their profits from the operation of the speculative fund. One-half of these profits will be divided among the paid-up annual subscribers to `The Tape and Ticker' in the unit dissolved and the remaining half of the profits will be paid to the publishers to cover the general expense of operating the speculative fund."
The proofs disclose that the defendants never utilized any of the subscriptions received by them of the aforesaid scheme, by a speculative fund, nor did they open any brokerage account in which purchase and sale of stock was made for the benefit of subscribers on a profit-sharing basis, nor did they divide among any other subscribers to "The Tape and Ticker" any profits from the so-called speculative fund. On September 6th, 1929, defendants sent to their subscribers a letter in which it was stated they had decided to abandon the above-mentioned speculative fund because less than two hundred and fifty people had subscribed. As a matter of fact, as the proofs indicate, more than twelve thousand persons had subscribed to "The Tape and Ticker" and the service connected therewith which was intended to include participation in the above-mentioned speculative fund. It appears also that the defendants after sending out their aforesaid market letter continued advertising participation in the above-mentioned speculative fund as one of the features of the service furnished to subscribers of "The Tape and Ticker." The proofs disclose that notwithstanding the magnitude of the operations *Page 360 
of defendants' enterprise and the large sum of money received by the defendants therefrom, the defendants, when called upon by the attorney-general to produce their books of account, produced an insignficant book which the defendant Wallace claimed was the only book of account kept. I cannot believe such to be the fact. It appears to me incredible that persons operating an enterprise of such magnitude as that operated by the defendants could or would successfully operate same by such meagre account. The proofs disclose that the defendants, when first appearing before the attorney-general for the purpose of examination as to their business activities, asked to be excused from testifying on the ground their answers might tend to incriminate them, but later, all of the defendants except Wallace disregarded such claim. The proofs disclose that moneys derived by means of the operation of defendants were deposited in the Labor National Bank of Jersey City, and elsewhere, and, as above stated, with the telephone company which rendered telephone service to them. It appears also that Charles Beadon, hereinabove mentioned, was a frequent visitor at the offices of Wallace Company. It appears also that a large number of so-called telephone salesmen were employed byWallace Company, and the payroll of said company was approximately $700 a week. I deem it unnecessary for my determination of the matter sub judice to recite more fully than hereinabove recited, the activities of Wallace Company.
It will suffice for me to say that the record of the matter subjudice is replete with proof of an iniquitous scheme perpetrated by the defendants on a gullible public whom the defendants by extravagant and dishonest representations were capable at the particular period of time when such representations were made to easily influence. I regard it as very significant that notwithstanding the apparent earnestness of argument advanced by counsel for the defendants as to the legality and honesty of purpose of the business enterprise conducted by Wallace Company, no proofs were submitted in defendants' behalf other than an affidavit of the defendant Wallace, and an affidavit by one Gerald B. Hartley. *Page 361 
Finding, as I do, from the proofs herein, that the defendants engaged in and operated a business enterprise, with respect to the sale of securities, by means of which, and of fraudulent misrepresentations and practices, the manifest purpose of chapter 79 of the laws of 1927, as amended, was flagrantly violated, and as a result of which a very large sum of money flowed to and was received by the defendants from fleeced victims of their iniquitous scheme, it ill becomes such defendants to claim through their counsel in the matter sub judice that the attorney-general is unauthorized by law to institute and prosecute the proceedings herein against them for the purpose sought to be attained by the attorney-general in behalf of the public. Some suggestion was made during the oral argument of the matter sub judice that the defendants had not wronged any persons residing within the State of New Jersey. Such, indeed, is a weak argument to advance to exonerate the defendants from their scheme of defrauding the public generally, and I regard it as untenable.
Defendants, through their counsel, urged that the prevention
of such practices as are prohibited by chapter 79 of the laws of 1927, as amended, is limited to the means of an injunction to be issued by the court thereunder. It is urged by counsel for the defendants that this court is without authority to appoint areceiver as auxiliary to an injunction in the matter subjudice. I am not in accord with counsel for the defendants in such respect. The New Jersey Securities act, supra, authorizes, by section 6, the issue of an injunction to the extent and for the purposes mentioned therein, and by section 7, the appointment of a receiver. In the latter section (a) it is provided: "Whenever the court of chancery shall issue any injunction provided for in section 6, against a person, partnership, company or association, it may appoint a receiver with power to sue for, collect, receive and take into his possession all the goods and chattels, rights and credits, moneys and effects, lands and tenements, books, records, documents, papers, choses in action, bills, notes and property of every description, derived by means of any practice declared *Page 362 
to be illegal and prohibited by this act, including also all property with which such property has been mingled, if such property cannot be identified in kind because of such comingling, and sell, convey and assign the same, and hold and dispose of the proceeds thereof under the direction of the court of chancery for the equal benefit of all who establish an interest therein by reason of the use and employment by the defendant of any practices herein declared to be illegal and prohibited; and the court shall have jurisdiction of all questions arising in said proceedings and may make such orders and decrees therein as justice and equity shall require." The attorney-general has called to the attention of the court the fact as disclosed by the records of the court that receivers have been appointed by this court for individuals under the New Jersey Securities act,supra, in quite a number of cases heretofore presented to the court by the attorney-general. I am of the opinion that I should follow, in the case sub judice, the established practice of the court in the premises.
Notwithstanding that the defendants have seen fit to remain quiescent as to the allegations of fraud made against them by the attorney-general in the matter sub judice, especially when strong proof has been presented by the attorney-general against them which appears to clearly manifest that the defendants were operating their iniquitous scheme to defraud such of the public as the defendants through their machinations and alluring, yet, fraudulent representations, attracted, and that said defendants illegally benefited thereby, they, through their counsel, appear to be content to urge as a means of circumventing the attorney-general in his praiseworthy efforts to put an end to the evils complained of, to allege unconstitutionality of the New Jersey Securities act, supra, and unconstitutional the proceedings of the attorney-general thereunder. In my judgment, a court of equity — of conscience — will disregard defendants' plea in such respect. The defendants having resorted to and practiced iniquity cannot appeal to a court of equity to exculpate them from their iniquity by means of suggesting that the constitutionality of the legislation which prohibits the acts the doing of which *Page 363 
constitutes their iniquity should be inquired into by the court in their behalf. In my judgment a court of equity should not inquire into the constitutionality of a statute such as the New Jersey Securities act, supra, a so-called blue sky law, at the instance of persons such as defendants herein, who, as clearly disclosed by the proofs in a proceeding instituted against them by the attorney-general for the benefit of the public at large, concocted an iniquitous business scheme clearly intended to defraud. A court of equity never lends its aid to the furtherance of schemes calculated to deceive and defraud the public, nor to the exoneration, directly or indirectly, of perpetrators of such schemes.
I will advise a decree as prayed for by the complainant.